1    BURTON C. JACOBSON, SBN 027529
      ALAN S. VERTUN, SBN 73022
2    424 S. Beverly Drive
      Beverly Hills, CA  90212
3

4    Telephone:    (310) 553-8533
      Facsimile:     (310) 203-9853

5    Attorneys for Plaintiff, E.G. GROUND
      MANAGEMENT, INC., a Nevada Corporation
6

7

8                **UNITED STATES DISTRICT COURT**

9                **CENTRAL DISTRICT OF CALIFORNIA**

10

11

| | |
|---|---|
| E. G. GROUND MANAGEMENT, INC., a Nevada corporation, | CASE No.:  2:15-cv-00055 RGK |
| Plaintiff, | |
| vs. | **PLAINTIFF E. G. GROUND MANAGEMENT, INCORPORATED'S OPPOSITION TO DEFENDANT YCHARTS, INCORPORATED'S MOTION TO DISMISS OR, ALTERNATIVELY TO TRANSFER VENUE** |
| YCHARTS, INC., a Delaware corporation, et al., | |
| Defendants. | |
| | DATE:          April 27, 2015 |
| | TIME:           9:00 a.m. |
| | COURTROOM:  850 |
| | JUDGE:        Hon. Robert G. Klausner |

# **TABLE OF CONTENTS**

Page

I.   BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . .   3

    A.  The Instant Complaint Should Not Be Dismissed . . . . . . . . . . . . . . . . . . . . . .   3

    B.  The Complaint Should Not Be Denied Based on the Terms and

        Conditions of Defendant Ycharts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

    C.  The "Economic Loss" Rule Does Not Bar Tort Claims of Action  . . . . . . . . . . .   8

    D.  The Court Should Grant Plaintiff's Request to File a Second

        Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

    E.  There Should Be No Change of Venue of the Instant Action . . . . . . . . . . . . .   11

III.  THE LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

BURTON C. JACOBSON
424 S., BEVERLY DRIVE
BEVERLY HILLS, CA 90212
(310) 553-8533

1

## TABLE OF AUTHORITIES

2

**Federal Cases:**                                                                 **Page**

3

Bell Atl. Corp. v. Twombley, 550 U.S. 554, 555, 127 S.Ct. 1955, 167 L.Ed.2[nd] 929 (2007) .   10

4

Cook, Perkiss & Liehe v. N. Cal. Collection Serv., 911 F.2[nd] 242, 247 (9th Cir. 1990) . . . .   9

5

6

Doe v. United States, 58 F.3[rd] 494  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

7

Ellis v. Costco Wholesale Corp., 372 Fed.Supp. 530 . . . . . . . . . . . . . . . . . . . . 13

8

Foster Poultry Farms v. Alkar-Rapidpak-MP Equipment, Inc., 868 F.Supp. 2nd 983  . . . . 9-10

9

Giles v. General Motors Acceptance Corp., 494 Fed. 3rd 863 . . . . . . . . . . . . . .   8

10

Gompper v. Visx, Inc., 298 F.3[rd] 893, 898 (9th Cir. 2002) . . . . . . . . . . . . . .   11

11

In Re Gilead Scie. Sec. Litig., 536 F.3[rd] 1049, 1056-57 (9th Cir. 2008) . . . . . . . . . . .   10

12

Johnson v. Riverside Healthcare Sys., 534 F.3[rd], 1116, 1121 (9th Cir. 2008)  . . . . . . .   10

13

Kevin Khoa Nguyen v. Barnes & Noble, Inc., (2014), 763 Fed.3[rd] 1171  (9th Cir. 2014) . . .  3-4

14

Knutson v. Sirius XM Radio, Inc., 771 F. 3rd 559 . . . . . . . . . . . . . .   7

15

Marceau v. Blackfeet Hous. Auth., 540 F.3[rd] 916, 919  (9th Cir. 2008) . . . . . . . . . . .   10

16

Mitsui Marine & Fire Ins., Ltd. v. Nankai Travel Intl. Co., Inc., 245 F.Supp.2[nd] 523 . . . .   12

17

Moss v. United States Secret Serv., 572 F.3[rd] 962, 969 (9th Cir. 2009) . . . . . . . . . .   11

18

Navarro v. Block, 250 F.3[rd] 729, 732 (9th Cir. 2001) . . . . . . . . . . . . . . .   10

19

Riviera Finance v. Trucking Services,, Inc., 904 F.Supp. 837 . . . . . . . . . . . . . . .   12

20

Schreiber Dist. v. Serv-Well Furniture Co., 806 F.2nd 1393 at 1401 (9th Cir. 1986) . . . . .   9

21

Sprewell v. Golden State Warriors, 266 F.3[rd] 979, 988 (9th Cir. 2001) . . . . . . . . . . .   10

22

Telesaurus VPC, LLC v. Power, 623 F.3[rd] 998, 1003 (9th Cir. 2010) . . . . . . . . . .  10-11

23

Vignomo v. Miller, 120 F.3[rd] 1075, 1077 (9th Cir. 1997) . . . . . . . . . . . . . .   10

24

///

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS . . .

1

**State Case:**

2

Robinson Helicopter Co., Inc. v. Dana Corp., 34 Cal. 4th 977 . . . . . . . . . . . . . . . .     8

3

4

**Federal Statutes**

5

28 U.S.C. 1404  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12,13

6

7

**Federal Rules**

8

9

Fed. Civ. P. 12(b)(6)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,10,11

10

Fed. Civ. P. 9(b)(12)     . . . . . . . . . . . . . . . . . . . . . . . . . .     13

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS . . .

## BACKGROUND

COMES NOW Plaintiff, E. G. Ground Management, Inc., a Nevada corporation, and opposes the motion to dismiss or alternatively, to transfer venue, filed by defendant Ycharts, Inc., a Delaware corporation (hereinafter "Ycharts").

This opposition is based on this memorandum of points and authorities as well as the Declaration of Elisha Gilboa.

Prior to plaintiff filing its opposition in the within matter, counsel for plaintiff had conversations with counsel for defendant Ycharts wherein an offer was made to file an amended complaint. (Plaintiff still desires to file an amended complaint in the within action.) Defendant Ycharts was asked to take the current motion off calendar to allow the filing of the amended complaint and Ycharts could then file any motion they wished concerning the amended complaint. It was the belief of plaintiff's counsel that this would be an important conservation of this Court's time. However, counsel for defendant Ycharts rejected this request.

It is plaintiff's position that the current motion should be denied in its entirety and that plaintiff be allowed to file an amended complaint.

Secondly, plaintiff opposes the motion for a change of venue to the United States District Court in Chicago, Illinois. It is plaintiff's position that this District Court is the proper venue as will be more fully explained hereinafter in the Points and Authorities submitted.

In the instant matter, plaintiff E. G. Ground Management, Inc. is a Nevada corporation and a resident of the State of Nevada. The Daphna Gilboa Family Trust (hereinafter referred to as "Family Trust") assigned by a power of attorney to Elisha Gilboa all rights to make investments on behalf of the Family Trust.

Elisha Gilboa does business through a corporation that he controls called E. G. Ground Management, Inc., a Nevada corporation.

The Daphne Gilboa Family Trust assigned to E. G. Ground Management, Inc., all of its rights concerning its claim against defendant Ycharts. Elisha Gilboa, acting on behalf of the Family Trust and through E. G. Ground Management, Inc., pursuant to the authority granted to Elisha Gilboa, all of the transactions with Ycharts were done by him and all the investments of the Family Trust were done by him. Elisha Gilboa, at all times material hereto, is a resident of the County of Los Angeles, State of California, and that all of the contact with Ycharts was done by him in the County of Los Angeles, State of California.

The investments herein involved were made pursuant to in accurate information supplied by Ycharts through the internet. The internet travels all over the world including Los Angeles, California.

The information supplied by Ycharts was not accurate, although their marketing and advertisements state the opposite.

At all times material hereto, Elisha Gilboa never clicked on the link nor read the terms and conditions of the Ycharts website.

Based on the inaccurate data supplied by defendant Ycharts, Elisha Gilboa on behalf of the Daphne Gilboa Family Trust, invested approximately $980,000 of the Family Trust's money.

The information supplied by Ycharts was faulty and incorrect, causing plaintiff's loss.

Had the information supplied by Ycharts been accurate and timely, Elisha Gilboa never would have made the investment.

Some time after the investment, when Gilboa learned that the information was not accurate, he complained to defendant Ycharts who admitted that the information was inaccurate and they have since corrected the inaccurate data.

As previously stated, plaintiff desires to amend the First Amended Complaint. At this point, plaintiff concedes that the Court should dismiss without prejudice the claims for (1) Fraud, (2) Third

Party Beneficiary and (3) Negligence.   However, plaintiff wishes to add additional counts to an amended Complaint which more accurately reflects the relationship between plaintiff and defendant.

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff agrees that the quasi-contract claim should be dismissed since there is in fact an actual contract between plaintiff and defendant Ycharts as admitted in defendant's motion.

Plaintiff seeks to amend his complaint to add counts of actual contract; Federal Trade Commission violations; false advertising; negligent misrepresentation of the advertising as well as the data; and fraud.

A.   The Instant Complaint Should Not Be Dismissed.

Contrary to defendant's assertions that the Complaint should be dismissed with prejudice, the cases they cite are inapposite to the facts of the instant case and contrary to the law of this District, this Circuit and the United States Supreme Court, as more fully briefed hereinafter.   Plaintiff argues that the facts and law do not allow this Complaint to be dismissed with prejudice.

Plaintiff's Complaint states facts sufficient to defeat a 12(b)(6) motion as outlined hereinabove.

B.   The Complaint Should Not Be Dismissed Based on the Terms and Conditions of Defendant Ycharts.

Defendant spends a great deal of time in their Brief, commencing at page 3 thereof, that plaintiff is bound by the "terms of use" which Ycharts claims is an integral part of the agreement between plaintiff and them.   However, they cite no cases from this Circuit or the State of California which indicate that that statement is true. As a matter of fact, recent cases state exactly the opposite.

The case of *Kevin Khoa Nguyen v. Barnes & Noble, Inc.* (2014), 763 Fed.3rd 1171, is a leading and most recent case to come out of the Ninth Circuit on this exact issue.   When this Court reads the *Barnes & Noble* case, they will immediately understand why the defendants in their motion

1    fail to cite it.

2        In the *Barnes & Noble* case, the terms of use on the Barnes & Noble website was part of a

3    "browsewrap" agreement, where the website terms and conditions of use were generally posted on

4    the website via a hyperlink at the bottom of the screen.   That is exactly the case here.   The Ninth

5    Circuit held that the website user had insufficient notice of Barnes & Noble's terms of use and thus

6    did not enter into an agreement with Barnes & Noble pursuant to those terms of use.   The Ninth

7    Circuit further held that where a website makes its terms of use available via a conspicuous

8    hyperlink on every page of the website but otherwise provides no notice to users nor prompts them

9    to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to the

10   relevant button users must click on – without more – is insufficient to give rise to constructive

11   notice.

12

13

14

15

16                                               **B.**

17   [7] "While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 403 (2d Cir.2004). One such principle is the requirement that "[m]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 29 (2d Cir.2002) (applying California law).

18

19   Contracts formed on the Internet come primarily in two flavors: "clickwrap" (or "click-through") agreements, in which website users are required to click on an "I *1176 agree" box after being presented with a list of terms and conditions of use; and "browsewrap" agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen. See Register.com, 356 F.3d at 428–30. Barnes & Noble's Terms of Use fall in the latter category.

20

21

22

23

24

25

26

27

28

BURTON C. JACOBSON.
424 S. BEVERLY DRIVE
BEVERLY HILLS, CA 90212
(310) 553-8533

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS . . .        Case No. 2:15-CV-00055 RGK

[8] "Unlike a clickwrap agreement, a browsewrap agreement does not require the user to manifest assent to the terms and conditions expressly ... [a] party instead gives his assent simply by using the website." Hines v. Overstock.com, Inc., 668 F.Supp.2d 362, 366–67 (E.D.N.Y.2009) (citation and quotation marks omitted) (alteration in original). Indeed, "in a pure—form browsewrap agreement, 'the website will contain a notice that—by merely using the services of, obtaining information from, or initiating applications within the website—the user is agreeing to and is bound by the site's terms of service.' " Fteja v. Facebook, Inc., 841 F.Supp.2d 829, 837 (S.D.N.Y.2012) (quoting United States v. Drew, 259 F.R.D. 449, 462 n. 22 (C.D.Cal.2009)). Thus, "by visiting the website—something that the user has already done—the user agrees to the Terms of Use not listed on the site itself but available only by clicking a hyperlink." Id. "The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists." Be In, Inc. v. Google Inc., No. 12–CV–03373–LHK, 2013 WL 5568706, at *6 (N.D.Cal. Oct. 9, 2013). "Because no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website, the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." Van Tassell v. United Mktg. Grp., LLC, 795 F.Supp.2d 770, 790 (N.D.Ill.2011) (citing Sw. Airlines Co. v. BoardFirst, LLC, No. 06–CV–0891–B, 2007 WL 4823761, at *4 (N.D.Tex. Sept. 12, 2007)); see also Mark A. Lemley, Terms of Use, 91 Minn. L.Rev. 459, 477 (2006) ("Courts may be willing to overlook the utter absence of assent only when there are reasons to believe that the [website user] is aware of the [website owner's] terms.").

Were there any evidence in the record that Nguyen had actual notice of the Terms of Use or was required to affirmatively acknowledge the Terms of Use before completing his online purchase, the outcome of this case might be different. Indeed, courts have consistently enforced browsewrap agreements where the user had actual notice of the agreement. See, e.g., Register.com, 356 F.3d at 401–04 (finding likelihood of success on the merits in a breach of browsewrap claim where the defendant "admitted that ... it was fully aware of the terms" of the offer); Sw. Airlines Co., 2007 WL 4823761, at *4–6 (finding proper contract formation where defendant continued its breach after being notified of the terms in a cease and desist letter); Ticketmaster Corp. v. Tickets.Com, Inc., No. CV–997654, 2003 WL 21406289, at *2C (C.D.Cal. Mar. 7, 2003) (denying defendants' summary judgment motion on browsewrap contract claim where defendants continued breaching contract after receiving letter quoting the browsewrap contract terms). Courts have also been more willing to find the requisite notice for constructive assent where the browsewrap agreement resembles a clickwrap agreement—that is, where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website. See, e.g., Zaltz v. JDATE, 952 F.Supp.2d 439, 451–52 (E.D.N.Y.2013) *1177 (enforcing forum selection clause where prospective members had to check box confirming that they both read and agreed to the website's Terms and Conditions of Service to obtain account); Fteja, 841 F.Supp.2d at 838–40 (enforcing forum selection clause in website's terms of service where a notice below the "Sign Up" button stated, "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service," and user had clicked "Sign Up").

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS ...        Case No. 2:15-CV-00055 RGK

[9] [10] But where, as here, there is no evidence that the website user had actual knowledge of the agreement, the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract. Specht, 306 F.3d at 30–31; see also In re Zappos.com, Inc. Customer Data Sec. Breach Litig., 893 F.Supp.2d 1058, 1064 (D.Nev.2012). Whether a user has inquiry notice of a browsewrap agreement, in turn, depends on the design and content of the website and the agreement's webpage. Google, 2013 WL 5568706, at *6. Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement. See, e.g., Specht, 306 F.3d at 23 (refusing to enforce terms of use that "would have become visible to plaintiffs only if they had scrolled down to the next screen"); In re Zappos.com, 893 F.Supp.2d at 1064 ("The Terms of Use is inconspicuous, buried in the middle to bottom of every Zappos.com webpage among many other links, and the website never directs a user to the Terms of Use."); Van Tassell, 795 F.Supp.2d at 792–93 (refusing to enforce arbitration clause in browsewrap agreement that was only noticeable after a "multi-step process" of clicking through non-obvious links); Hines, 668 F.Supp.2d at 367 (plaintiff "could not even see the link to [the terms and conditions] without scrolling down to the bottom of the screen—an action that was not required to effectuate her purchase"). On the other hand, where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, courts have been more amenable to enforcing browsewrap agreements. See, e.g., Cairo, Inc. v. Crossmedia Servs., Inc., No. 04–04825, 2005 WL 756610, at *2, *4–5 (N.D.Cal. Apr. 1, 2005) (enforcing forum selection clause in website's terms of use where every page on the website had a textual notice that read: "By continuing past this page and/or using this site, you agree to abide by the Terms of Use for this site, which prohibit commercial use of any information on this site"). But see Pollstar v. Gigmania, Ltd., 170 F.Supp.2d 974, 981 (E.D.Cal.2000) (refusing to enforce browsewrap agreement where textual notice appeared in small gray print against a gray background). In short, the conspicuousness and placement of the "Terms of Use" hyperlink, other notices given to users of the terms of use, and the website's general design all contribute to whether a reasonably prudent user would have inquiry notice of a browsewrap agreement.

Barnes & Noble argues that the placement of the "Terms of Use" hyperlink in the bottom left-hand corner of every page on the Barnes & Noble website, and its close proximity to the buttons a user must click on to complete an online purchase, is enough to place a reasonably prudent user on constructive notice. It is true that the location of the hyperlink on Barnes & Noble's website distinguishes this case from Specht, the leading authority on the enforceability of browsewrap terms under New York law. There, the Second Circuit refused to enforce an arbitration provision *1178 in a website's licensing terms where the hyperlink to the terms was located at the bottom of the page, hidden below the "Download" button that users had to click to initiate the software download. See Specht, 306 F.3d at 30. Then–Second Circuit Judge Sotomayor, writing for the panel, held that "a reference to the existence of license terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms." Id. at 32. By contrast, here the "Terms of Use" link appears either directly below the relevant button a user must click on to proceed in the checkout process or just a few inches away. On some pages, the content of the webpage is compact enough that a user can view the link without scrolling. On the remaining pages, the hyperlink is close enough to the "Proceed with Checkout" button that a user would have to bring the link within his field of vision in order to complete his order.

But the proximity or conspicuousness of the hyperlink alone is not enough to give rise to constructive notice, and Barnes & Noble directs us to no case law that supports this proposition.1 The most analogous case the court was able to locate is PDC Labs., Inc. v. Hach Co., an unpublished district court order cited by neither party. No. 09–1110, 2009 WL 2605270 (C.D.Ill. Aug. 25, 2009). There, the "Terms [and Conditions of Sale] were hyperlinked on three separate pages of the online ... order process in underlined, blue, contrasting text." Id. at *3. The court held that "[t]his contrasting text is sufficient to be considered conspicuous," thereby placing a reasonable user on notice that the terms applied. Id. It also observed, however, that the terms' conspicuousness was reinforced by the language of the final checkout screen, which read, " 'STEP 4 of 4: Review terms, add any comments, and submit order,' " and was followed by a hyperlink to the Terms. Id. (emphasis added).

As in PDC, the checkout screens here contained "Terms of Use" hyperlinks in underlined, color-contrasting text. But PDC is dissimilar in that the final screen on that website contained the phrase "Review terms." PDC Labs., 2009 WL 2605270, at *3. This admonition makes PDC distinguishable, despite the court's explanation that the blue contrasting hyperlinks were sufficiently conspicuous on their own. That the PDC decision couched its holding in terms of procedural unconscionability rather than contract formation further distinguishes it from our case. See id.

[11] In light of the lack of controlling authority on point, and in keeping with courts' traditional reluctance to enforce browsewrap agreements against individual consumers,2 we therefore hold that where *1179 a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice. While failure to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract, Gillman v. Chase Manhattan Bank, N.A., 73 N.Y.2d 1, 11, 537 N.Y.S.2d 787, 534 N.E.2d 824 (1988), the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers. Given the breadth of the range of technological savvy of online purchasers, consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason

to suspect they will be bound.

Barnes & Noble's argument that Nguyen's familiarity with other websites governed by similar browsewrap terms, including his personal website <www.kevinkhoa.com>, gives rise to an inference of constructive notice is also of no moment. Whether Nguyen has experience with the browsewrap agreements found on other websites such as Facebook, LinkedIn, MySpace, or Twitter, has no bearing on whether he had constructive notice of Barnes & Noble's Terms of Use. There is nothing in the record to suggest that those browsewrap terms are enforceable by or against Nguyen, much less why they should give rise to constructive notice of Barnes & Noble's browsewrap terms.

See also *Knutson v. Sirius XM Radio, Inc.*, 771 Fed. 3rd 559.

The Court should not dismiss plaintiff's Complaint based upon the terms and conditions.

## C.   The "Economic Loss" Rule Does Not Bar Tort Causes of Action.

Both the United States Court of Appeals for the Ninth Circuit and the California Supreme Court have indicated that the economic loss doctrine does not bar fraud claims.

*Giles v. General Motors Acceptance Corp.*, 494 Fed. 3rd 863;  *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal.4[th] 979.    Those cases are dispositive on the issue of the economic loss doctrine barring tort claims as well as breach of contract claims.  The Ninth Circuit states in *Giles v. General Motors Acceptance Corp.*, *supra*, as follows:

"(a)    Economic loss doctrine.  Appellants appeal the dismissal of the tort claims for fraud, conversion, constructive fraud, undue influence and breach of fiduciary duty.   They contend that the District Court erred in holding that these claims are barred under Nevada's economic loss doctrine.   For the reasons that follow, we agree with appellants that their tort claims for fraud and conversion are not barred because we agree with GMAC that it owed no fiduciary duty to Appellants, we do not decide whether Appellants' claim for breach of a fiduciary duty is barred by the economic loss doctrine.   For the same reason we also do not decide whether the economic loss doctrine bars Appellants' claim for constructive fraud and undue influence because under Nevada law, those claims require a breach of an underlying fiduciary duty (it should be noted that plaintiffs do not make those claims).    Broadly speaking, the economic loss doctrine is designed to maintain the distinction between damage remedies for breach of contract and for tort.   'Economic Loss' refers to damages that are solely monetary as opposed to damages involving physical harm to a person or property."

The Court should not dismiss plaintiff's Complaint with prejudice based upon the facts and laws stated above.

BURTON C. JACOBSON,
424 S. BEVERLY DRIVE
BEVERLY HILLS, CA 90212
(310) 553-8533

8.

**D.   The Court Should Grant Plaintiff's Request to File a Second Amended Complaint.**

As stated previously, plaintiff desires to file a Second Amended Complaint.   Although defendants were asked to stipulate to taking their current motion off calendar so that the plaintiff could file a Second Amended Complaint, and then they could file whatever monition they wished concerning that Second Amended Complaint.  As stated previously, defendants have refused.

Plaintiff has agreed that the quasi-contract claim should be dismissed since there is in fact an actual contract between plaintiff and defendant Ycharts.    Further, plaintiff seeks to amend its complaint to add claims of actual contract; Federal Trade Commission violations; false advertising; negligent misrepresentation of the advertising as well as the data;  and fraud.

As stated by the Ninth Circuit in *Doe vs. United States* (58 F.3rd 494), "In dismissing for failure to state a claim, 'a District Court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the plaintiff could not possibly be cured by the allegation of other facts.'   *Cook, Perkiss & Liehe vs. N. Cal. Collection Serv.*, 911 F.2nd 242, 247 (9th Cir. 1990).

The *Doe* case goes on to further state "In fact, the District Court provides no justification for its dismissal of Doe's tort claims at all.  'Because the District Court did not determine, nor can we conclude, that the allegation of other facts could not possibly cure the deficiency in [Doe's] complaint, the District Court abused its discretion in dismissing [the Complaint] with prejudice. (Citing *Schreiber Dist. v. Serv-Well Furniture Co.*, 806 F.2nd 1393 at 1401 [9th Cir. 1986])."

Lastly, the *Doe* case states, "We conclude, therefore, that the District Court erred in dismissing Doe's tort claims without leave to amend and in not granting Doe an opportunity to conduct discovery into the relevant jurisdictional facts."

In *Foster Poultry Farms v. Alkar-Rapidpak-MP Equipment, Inc.*, 868 F.Supp.2nd 983, the Court stated as follows:

1   "Under Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed because of the

2   plaintiff's 'failure to state a claim upon which relief can be granted.' Fed.R.Civ.P. 12(b)(6). A

3   dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or on the

4   absence of sufficient facts alleged under a cognizable legal theory. *Johnson v. Riverside Healthcare*

5   *Sys.*, 534 F.3rd 1116, 1121 (9th Cir. 2008); *Navarro v. Block*, 250 F.3rd 729, 732 (9th Cir. 2001). In

6   reviewing a complaint under Rule 12(b)(6), all allegations of material fact are taken as true and

7   construed in the light most favorable to the non-moving party. *Marceau v. Blackfeet Hous. Auth.*,

8   540 F.3rd 916, 919 (9th Cir. 2008); *Vignono v. Miller*, 120 F.3rd 1075, 1077 (9th Cir. 1997). The

9   Court is not required 'to accept as true allegations that are merely conclusory, unwarranted

10  deductions of fact, or unreasonable inferences.' *In Re Gilead Scie. Sec. Litig.*, 536 F.3rd 1049, 1056-

11  57 (9th Cir. 2008); *Sprewell v. Golden State Warriors*, 266 F.3rd 979, 988 (9th Cir. 2001). As the

12  Supreme Court has explained:

13
14
15          'While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not

16             need detailed factual allegations, a plaintiff's obligation to provide the "grounds"

17             of his "entitlement to relief" requires more than labels and conclusions, and a

18             formulaic recitation of the elements of a cause of action will not do. Factual

19             allegations must be enough to raise a right to relief above the speculative

20             level, on the assumption that all the allegations in the complaint are true

21             (even if doubtful in fact).'

22
23  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2nd 929 (2007).

24      To avoid a Rule 12(b)(6) dismissal, 'a complaint must contain sufficiency factual matter,

25  accepted as true, to state a claim to relief that is plausible on its face[.]' *Telesaurus VPC, LLC v.*

26  *Power*, 623 F.3rd 998, 1003 (9th Cir. 2010)(citations omitted). 'In sum, for a complaint to survive a

27  motion to dismiss, the non-conclusory "factual content," and reasonable inferences from that

28

BURTON C. JACOBSON
424 S. BEVERLY DRIVE
BEVERLY HILLS, CA 90212
(310) 553-8533

10.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS . . .          Case No. 2:15-CV-00055 RGK

content, must be plausibly suggestive of a claim entitling the plaintiff to relief.'   *Moss v. United States Secret Serv.*, 572 F.3rd 962, 969 (9th Cir. 2009).

If a Rule 12(b)(6) motion to dismiss is granted, '[the] district court should grant leave to amend even if no requested to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'   *Doe v. U. S.*, *supra*, at p. 497.   In other words, leave to amend need not be granted when amendment would be futile.   *Gompper v. VISX, Inc.*, 298 F.3rd 893, 898 (9th Cir. 2002)."

Based upon the above the court should grant plaintiff leave to file a seconded amended complaint.

**E.   There Should Be No Change of Venue of the Instant Action.**

It is important to note that plaintiff's argument hinges in large part to the fact the Ycharts had a contract with Morningstar and both those companies are Chicago, Illinois, companies.   Plaintiff hastens to point out the fact the Morningstar has been dismissed from the instant action; therefore, the declarations contained in their motion concerning the contract between Ycharts and Morningstar are now irrelevant.

Facts, as stated in the complaint, are as follows:

Elisha Gilboa (hereinafter referred to as Gilboa), had the power of attorney for the Daphne Gilboa Family Trust and he is authorized by that Trust to make investments on behalf of the Trust.

Further, as stated in the complaint, Mr. Gilboa contracted with Ycharts, i.e., he paid a premium price for use of the financial data that Ycharts supplied through the internet, relying on their advertisements that their data was accurate and current.

Mr. Gilboa did his research using Ycharts to obtain financial data for the purpose of investing.   Mr. Gilboa did in fact make investments using the Ycharts data which later turned out to be inaccurate and not current.   As a matter of fact, plaintiff will show that Ycharts, in an email,

BURTON C. JACOBSON,
424 S. BEVERLY DRIVE
BEVERLY HILLS, CA 90212
(310) 553-8533

11.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS . . .      Case No. 2:15-CV-00055 RGK

admitted that the data was inaccurate and not current.

Mr. Gilboa does business through E. G. Ground Management, Inc., a company which he controls.

Mr. Gilboa at all times material hereto was a resident of Los Angeles County, State of California.   As a matter of fact, Mr. Gilboa never was a resident of Illinois nor of Nevada.   All of the transactions of the investment and the use of the data of Ycharts occurred in Los Angeles, California.

It is well established that the internet travels everywhere, including Los Angeles, California. And Ycharts did its business through the internet.

## THE LAW

28 U.S.C. §1404 lists all the considerations that the Court must give that relate to that section.

It is important to note that defendant Ycharts does not name a single witness in their motion to transfer venue.   The courts have held that the party seeking transfer must clearly specify key witnesses to be called and must make a general statement of what their testimony will cover.   See *Mitsui Marine & Fire Ins. Co. Ltd. v. Nankai Travel Intl. Co., Inc.*, 245 F.Supp.2nd 523.

Plaintiff submits that they have not met their burden.

It is obvious that Mr. Gilboa is the only material witness in the instant action and defendant Ycharts, in their motion to transfer venue, do not mention a single witness.   As a matter of fact, the courts have held that convenience of witnesses' analysis, for purposes of change of venue motion, looks at the persons who will be required to take time away from their respective home bases and activities to deal with trial preparation, depositions and otherwise, and with the trial.   *Riviera Finance v. Trucking Services, Inc.*, 904 Fed.Supp. 837.

It is respectfully submitted that defendant Ycharts has not met its burden for a change of

BURTON C. JACOBSON.
424 S. BEVERLY DRIVE
BEVERLY HILLS, CA 90212
(310) 553-8533

12.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS . . .          Case No. 2:15-CV-00055 RGK

venue to the Northern District of Illinois.   As a matter of fact, factors to be considered in deciding whether to transfer an action for the convenience of parties and witnesses, in the interest of justice, include the level of congestion of the local docket, the local public interest in the outcome of a case, <u>avoidance of conflict of laws issue</u> [emphasis added], and the unfairness of burdening citizens in an unrelated forum with jury duty.   *Ellis v. Costco Wholesale Corp.*, 372 Fed.Supp. 530.

We agree with defendant Ycharts that the most important factor to be considered by the Court is the convenience of witnesses.   Since defendant Ycharts has not cited a single witness that they will call or generally what that witness would say, it is obvious that they have not met their burden.   The only key witness in this case is Mr. Gilboa, who is a resident of Los Angeles County, State of California.

It is therefore respectfully submitted that defendant Ycharts' motion to dismiss pursuant to 9(b)12 and their motion to transfer pursuant to 28 U.S.C. § 1404 should be denied.

Respectfully submitted,

DATED: April 9, 2015

Burton C. Jacobson, Attorney for Plaintiff
E. G. Ground Management, Inc., a
Nevada Corporation

Alan S. Vertun, Attorney for Plaintiff
E. G. Ground Management, Inc., a
Nevada Corporation

BURTON C. JACOBSON.
424 S. BEVERLY DRIVE
BEVERLY HILLS, CA  90212
(310) 553-6533

13.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS . . .          Case No. 2:15-CV-00055 RGK